MARGARET HARRINGTON, Respondent, v. CHI-
CAGO, BURLINGTON & QUINCY RAILROAD
COMPANY, Appellant.

**Kansas City Court of Appeals, April 1, 1912.**

**NEGLIGENCE: Master and Servant.** Plaintiff sued for damages
for the death of her husband, a switchman in the employ of
defendant, which occurred while he was assisting in placing
three cars of coal in the company's elevated coal shed or chute.
At the time, he ws seated on the end of an empty flat car next
to the first loaded coal car with his feet over the edge of and
resting on the brake platform, where he could cut out the three
loaded coal cars when they were properly placed. The switch
engine was in a crippled condition and had been for several
hours to the knowledge of the engineer. The train did not stop
when signals were given, but continued on and struck a sand
car in the chute with great force. Another employee uncoupled
the loaded cars and when the train moved back the body of
plaintiff's husband was discovered on the track between where
the last empty and the first coal car had last stood. *Held*, that
all the facts and circumstances in evidence show beyond a
reasonable doubt that the deceased fell from the car at or near
the place where his body was found and that he was not jarred
from his position by the force of the collision.

Appeal from Jackson Circuit Court.—*Hon. James H.
Slover*, Judge.

REVERSED AND REMANDED.

*Warner, Dean, McLeod & Timmonds* for appel-
lant.

*Henry J. Latshaw* for respondent.

BROADDUS, P. J.—This suit was instituted by
the plaintiff to recover damages on account of the
death of her husband, caused by the alleged negligence
of the defendant railroad company. The plaintiff
recovered judgment in the sum of $5600 from which
defendant appealed to this court.

For a clear comprehension of the issues raised by the appeal it becomes necessary to set forth the grounds upon which the plaintiff relied to make out her case. Omitting preliminary statements of the petition, the allegations of negligence on the part of the defendant are as follows: "Plaintiff states that on said 11th day of December, 1909, and for a long time continuously prior thereto plaintiff's husband, Patrick Harrington, was in the employ of defendant as a switchman in defendant's said yards, and as said switchman for defendant it became and was the duty of plaintiff's said husband to get upon, ride upon and be upon certain freight cars and especially the freight cars hereinafter referred to, while said cars were being moved over and upon the tracks of defendant's in the aforesaid switch yards, and more especially into a certain coal house or coal shed hereinafter referred to.

"Plaintiff states that at all said times defendant owned, controlled and used in said switch yards a certain incline track leading into and running into and through a certain coal shed or house in said switch yards, that said coal shed or house was a long frame structure elevated above the ground at a distance of from twenty to thirty feet, and was about one hundred feet in length, that one of defendant's aforesaid tracks proceeded up the incline and into said coal shed. That it was the duty of plaintiff's said husband on said 11th day of December, 1909, in the performance of his said duties as said switchman of defendant to be upon certain coal cars then and there being pushed, shoved, or run by defendant up said incline and into said coal shed; that upon the occasion herein referred to defendant through its servants and agents was then and there in the act of shoving, pushing or running certain freight cars including coal cars up said incline and into said coal shed, that while plaintiff's said husband was in the performance of his said duties as said

switchman for defendant, and while acting within the line of his duties as said switchman, he was thrown from one of said cars, and onto the tracks of defendant's at or near the entrance of said shed on account of the carelessness and negligence of defendant, its servants and agents as hereinafter set forth in allowing, permitting and causing said car to be run up said incline and into said coal shed and against a certain flat car called a sand car, then and there standing on the track at or near said coal shed and upon said elevated structure.

"Plaintiff states that on account of the carelessness and negligence of defendant's servants and agents above referred to and hereinafter set forth her said husband, Patrick Harrington, was then and there thrown from said car and upon said track and was then and there run over, upon and against and was dragged, pushed and shoved by the wheels of the aforesaid cars, and plaintiff's said husband was thereby and on account thereof, and as direct result thereof, then and there killed.

"Plaintiff states that the carelessness and negligence of defendant, its servants and agents above referred to consisted in this, to-wit:

"First. Defendant, through its servants and agents then and there in charge of said engine and cars carelessly and negligently ran said cars up said incline and into said coal shed, and into and against said sand car at a dangerously high rate of speed, and at a recklessly high rate of speed, and at an unnecessarily and unusually high rate of speed.

"Second. Defendant, through its servants and agents then and there in charge of said engine and cars carelessly and negligently failed and neglected to have said engine and cars under proper control, while said cars were proceeding up said incline, into and through said coal shed, but on the contrary defendant's said servants and agents ran, pushed or

shoved said cars up said incline and into and through said coal shed while said cars were so out of control of said employees in charge thereof, that said engine and cars could not be properly stopped, or the speed thereof properly checked in a reasonable time, or reasonable space to properly handle said cars with safety to said employees and to properly place said cars where they were intended and desired to be placed.

"Third. Defendant's said servants and agents then and there in charge of said engine and cars, carelessly and negligently failed and neglected to stop said cars at the proper place, which was before said cars run in contact with, struck or hit said sand car. Plaintiff states that it was the desire and intention of defendant that the car furthest from said engine should be stopped or 'spotted' at a point before the same reached said sand car, or struck said sand car, or run into said sand car, but through the carelessness and negligence of said servants and agents then and there in charge of said engine and cars, in running said cars and in not stopping said cars at the proper place, and in not 'spotting' said cars in the proper place, said cars were permitted, allowed and caused to run against, into, and upon said sand car as above set forth.

"Fourth. The servants and agents of defendant then and there in charge of said engine and carelessly and negligently run said cars too far, thereby striking and running into the aforesaid sand car, thereby causing said cars and especially the car upon which plaintiff's said husband was riding as aforesaid, to jerk, jolt, stop or slacken its speed in a quick, sudden and violent manner, and in an unnecessarily and unusually quick, sudden and violent manner, thereby throwing plaintiff's said husband and causing plaintiff's said husband to fall from said car onto the track, and to be run over and killed as above set forth.

"Fifth. The servants and agents of defendant then and there in charge of said engine and cars carelessly and negligently failed to give the proper signals or to give said signals at the proper time to stop said cars at the proper place and to stop said cars before they ran into, upon and against the sand car all as above set forth.

"Sixth. The servants and agents of defendant's then and there in charge of defendant's said engine and cars carelessly and negligently failed and neglected to properly obey and act upon the signals given them to stop said cars before said cars ran into, upon and against said sand car, all as above set forth.

"Seventh. The servants and agents of defendant then and there in charge of said engine and cars, carelessly and negligently failed and neglected to tell plaintiff's said husband or to warn plaintiff's said husband, that said cars were going to be, or about to be run into, upon or against said sand car, all as above set forth.

"Eighth. Defendant and its servants and agents then and there in charge of said engine and cars, and the servants and agents then and there in charge of said switch yard, and in charge of said coal house or coal shed, and in charge of said sand car, each and all of them carelessly and negligently left said sand car standing upon said tracks at the time and place it was standing as above set forth, and plaintiff further states that defendant and its said servants and agents each and every one, and all of its said servants and agents, at all said time and for a long time prior thereto knew, or by the exercise of ordinary care and caution should have known that said sand car so standing was dangerous to the lives and limbs of the switchmen in charge of cars, and especially of plaintiff's said husband at or near said coal chute.

"Ninth. The servants and agents of defendant, then and there in charge of defendants' said engine

and cars carelessly and negligently stopped said cars after they had struck the sand car as above set forth, too suddenly and with a violent, sudden, quick and severe jerk, and with an unusually and unnecessarily quick, severe, sudden stop, jerk or jolt.

"Tenth. Plaintiff states that the engine which defendant was using to push, haul or shove said cars at said time or place was defective, unsafe and dangerous in this, to-wit: The brakes and brake appliances upon said engine were old, worn, defective, insufficient and dilapidated, the brake shoes were worn to such an extent that they failed and refused at said time and place to properly clamp or catch, or touch, or press upon or against the wheels of the engine, and said brakes and appliances connected therewith were so out of repair and work that said brakes failed and refused at said time and place to properly work, or to properly clamp, touch or press upon the wheels of said engine. Plaintiff states that the wheels of said engine were so defective and worn and the said brakes so improperly constructed and maintained in reference to said wheels, that said brakes did not and could not properly at said time and place, brake or stop said wheels. Plaintiff states that said defective condition of said brakes and wheels and said other appliances and each and all of said defects in said brakes and apparatus connected therewith and said wheels existed upon said December 11, 1909, and for a long time prior thereto, and at all said times defendant knew, or by the exercise of ordinary care and caution could have known of all said defects and the danger arising therefrom, and that defendant knew, or by the exercise of ordinary care and caution could have known thereof for a reasonable time prior to said December 11, 1909, to have had reasonable time and opportunity to have repaired said defects, and each and all of said defects, prior to said December 11, 1909.

"Plaintiff states that on account of, and as a direct result of said negligence of defendant, and of defendant's servants and agents as above set forth, and on account of and as a direct result of, each and every one of said acts of negligence of defendant, its said servants and agents, plaintiff's said husband while in the performance of his duties as above set forth, was thrown from or caused to fall from the car he was upon as above set forth, and injured and killed as above set forth."

The answer consists of a general denial, a plea of assumption of risks by the deceased, and a plea of contributory negligence on his part.

A blue print used on the trial, illustrating the scene and accompaniments where the plaintiff's husband met his death, is almost necessary in order to understand the testimony in the case.

The plaintiff's husband, a man twenty-two years of age, was killed on the morning of December 11, 1909, at about 7 o'clock a. m. At the time he was in the service of the defendant company as a switchman; his hours of work being from 8 o'clock p. m. to 7:30 a. m. The crew engaged at the time plaintiff was killed consisted of five men, an engineer and fireman, a foreman, who gave signals to the engineer, and two switchmen, of whom the deceased was one. The deceased's work was at the rear end of the train to couple and uncouple cars. The other switchman's duties were near the head of the train where he could receive and transmit signals to the engineer. The morning was foggy, extremely cold, and there was some frost on the cars; and as the light was not sufficient for the purpose, the members of the crew were working with lanterns. The crew were engaged in placing three carloads of coal in the company's coal shed or chute, the location of which and the tracks approaching it are shown by the blue print referred to. The length of the shed was sufficient to hold three cars at one time, and when

so occupied the end cars extended to about the open-
ings at either end. The track extended through the
shed and beyond and ended at a bumper. The shed
and track approaching it extended north and south.
At the time in question there was a car of sand stand-
ing on the track about ten or fifteen feet of the south
opening of the shed. There were also three empty
cars standing in the shed.

The crew first ran a train consisting of the engine,
one box car next to the engine, and four empty cars
up the incline to the coal shed, and coupled on to the
three empties. It then descended the incline and went
to another track and took on three coal cars. The
train again ascended the incline to the coal chute to
place the three cars of coal in the shed for unloading.
As the train approached the shed the three loaded cars
came first, followed in order by the seven empty flat
cars, and next the box car and engine. At that time
deceased was seated on the south end of the last empty
flat car, next to the first loaded coal car, with his feet
over the edge of and resting on the brake platform
where he could cut out the three loaded cars of coal.
The other switchman was on top of the box car next
to the engine receiving and giving signals to the en-
gineer. All the employees were at their proper places.
The foreman was on the ground thirteen feet below
giving signals for the movement of the train. The
evidence tended to show that the engine was in a crip-
pled condition, the piston rod was broken, and the
brakes did not work properly on the driver wheels on
one side of the engine, and had been in that condition
for several hours previously; and that its condition
was known by the engineer. When the train had
reached a point for a stop signal to be given, in order
that the three cars of coal would be left at the proper
place, the foreman gave the usual signal which was
by the switchman on the box car transmitted to the
engineer, the train did not stop; the foreman again

signalled for an immediate stop, which was also transmitted to the engineer, but the train failing to stop, the signals were repeated until it did stop. Just as the foreman gave the signal for an immediate stop he saw the deceased at his post at which time he was just entering the shed. He was not seen again while alive. The train struck the sand car standing on the track with such force as to drive it against the bumper and to break the bolts connecting it and twisting it partially around. The foreman then signalled for the train to move back so as to bring the car on which deceased was or had been riding out of the shed and to leave the loaded cars at their proper places for unloading. One of the defendant's employees at the shed heard the crash, came out and uncoupled the three loaded cars from the train which then moved down the incline. Soon after the train had separated from the coal cars, one of defendant's unloaders discovered the body of deceased on the track between where the last empty and the first coal car had last stood.

The deceased was dressed in heavy clothing which was pressed down on his body, but it was not cut. A witness stated that the body was lying on the track six or eight feet out from the end of the shed, across the west rail; that he was lying on his face, his head and shoulders, and the biggest part of his body lying between the rails with his feet and legs lying outside the rails on the west side; that it "looked as though he had been run over right across the small of his back;" that he "had on considerable clothing, and his clothing wouldn't give much evidence of the injury he received; and that his clothes were only mashed down onto him;" and he did not notice any cuts in them.

The plaintiff insisted that the lantern that deceased carried was found inside of the coal shed under the middle of the first car, and at a point where the car on which he was riding was when the colli-

sion occurred, and a witness so stated, but on cross-examination he testified that he did not see it there. The evidence showed that on the coal car next to the. car on which deceased was stationed, the journals, oil boxes, truck frames and the lower bolts on them, extended to within a few inches of the top of the rails.

It is urged by the appellant that the respondent failed to prove her cause of action. It is insisted that the deceased must have fallen at the place where his body was found, outside of the shed, consequently, he could not have been thrown from his position where the collision occurred more than sixteen feet away inside of the shed. Had the lantern been found inside of the shed it would have been a circumstance tending to show that he fell off at the point where it was found, but as that fact was not shown, therefore, we must look for other evidence, if there be any, to sustain respondent's theory of the case, that deceased was thrown from the car by the violent collision mentioned. Respondent's theory is that his body, after he fell off the car, was caught by some parts of the coal car next to him and dragged outside the shed where his body was found. Standing alone without any corroborating circumstances, the fact that some part of the car which extended to within a few inches of the rails of the track caught and dragged the body a distance of sixteen feet or more has but little or no probative force. Such might have occurred, but if it did, there would have been some corroborating circumstances. It could not possibly have occurred unless there would have been some evidence of it left on his body or clothing or on both. Instead, his clothes were not cut or torn, and his body was not shown to have been injured except at his loin, which lay across the rail where he was found. It is true he was not seen by any of the other employees after he went inside of the shed, still, it is only negative evidence at best,

and certainly not sufficient to overturn the physical facts and circumstances we have mentioned.

A witness for the defense, but not one of the appellant's employees, was passing along while the switching was going on, and saw a person going down between the cars at the point where deceased was found, but thought he was engaged in uncoupling cars and gave it no further thought until he returned afterward and learned what had happened.

This is not a case where the rule of *res ipsa loquitur* applies, but is one based upon specific allegations of negligence upon the part of appellant and its employees in producing the said collision which resulted so fatally to respondent's husband. We think it may be inferred from the evidence that the cause of the collision was the crippled condition of the engine, which did not respond to the efforts of the engineer to control it and that the engineer who knew its defects was negligent in using it at the time. But we do not think there was any negligence shown as against any of the other operators and no blame can be attached to them for what occurred. The undisturbed condition of the clothing of deceased and the absence of mutilation of his body, other than where it lay across the track, show beyond all reasonable doubt that deceased fell from the car at or near the place where his body was found, and that he was not jarred from his position by the force of said collision. For the reasons given the cause is reversed. All concur.

PER CURIAM.—Opinion modified so that the cause may stand reversed and remanded instead of reversed outright.